Michael Carvin v. The Appellants We believe that this incitement case fails at the threshold. President Trump neither said any words which advocated nor clearly implied violent, tumultuous conduct under the statute or imminent lawless action under the Constitution. So the Kentucky statute doesn't reach his speech, and if it did, it would be unconstitutional under the First Amendment. All Mr. Trump said was, get him out of here. That's not advocating imminent lawless action, that's perfectly lawful action. He has a common law right, under Kentucky law, to exclude unwanted intruders, and he has, under this court's decision in Systrunk, a First Amendment right to exclude people who are interfering with his message to his supporters. So far from being unlawful, it was perfectly lawful. The only way it would become unlawful was if he had advocated the use of excessive force, more force than was reasonably necessary to remove these people from the venue. And obviously the words here pale in comparison to the words that the Supreme Court has said are protected as a matter of law. In Claiborne, he said we're going to break their damn necks. In the Hess case, they said we're going to take the F in street again, but both of these were held constitutionally protected by the Supreme Court as a matter of law. So the district court suggested he needed further discovery to look at the context, but we know the context. The context was at the core of the First Amendment. The context was a president running, somebody running for the presidency of the United States at a campaign rally. And this is precisely the kind of thing that the court said in Claiborne, which would involve highly charged rhetoric, and which court should approach with extreme care. They don't want to interfere in that exercise of the First Amendment. All right, Mr. Cannon, your defenses are, you have two different defenses. One, you allege that the complaint fails to state a claim under Kentucky law for incitement to riot. And secondly, that Mr. Trump's statements, or President Trump's statements now, are protected by the First Amendment. Would you want us to rule on both defenses in this case? Obviously, under Ashwander, if you can go off on the non-constitutional ground, the statutory ground, that would be more than sufficient. We think any ambiguity in terms of whether the Kentucky statute reaches our conduct is satisfied by, first, the rule of lenity and the doctrine of constitutional avoidance, that any expansive interpretation of the statute to reach the innocuous speech here would render it unconstitutional. I'm not asking for a constitutional ruling, but we think the Constitution is clearly on our side. Isn't it another way of looking at it, at least potentially, that whether construction one way or not renders it unconstitutional, it should be considered in the construction of the statute? That was right. We keep the First Amendment in mind and hopefully try to avoid it. My shorthand reference to that, Judge McKeague, was constitutional avoidance. It's a well-established proposition that if there's even a marginally reasonable interpretation of the Kentucky statute that doesn't plunge the court into this constitutional area, it should be interpreted in a way that avoids that constitutional... So I think the First Amendment will always be lurking in the background, even if you don't expressly... But what saves this, the fact that he didn't say, get them out of here and make sure they never come back or be rough with them or break their necks? The only way this language would be advocating imminent lawless action or satisfy the statute would be if he said, engage in excessive force, physically assault these people and removing them. He didn't say anything like that. Quite the contrary, he said just the opposite. He said, get them out of here. Then he said, don't hurt them. At other points, he said, forget them, ignore them. So there's no way that you can interpret those words to do excessive force. That's particularly true in the context of the First Amendment, where, as this court emphasized in Bible Believers, the scales are weighted very heavily in favor of the free speech side. So if there's any ambiguity, the speaker wins. That's also the teaching of the court in Wisconsin right to life, where they were confronted actually with a very similar claim to what's being done here. The plaintiffs in the district court want you to skip over the threshold issue of whether or not the words actually convey excessive force and jump to the questions. That first question is purely legal and jump to the questions that they say involve facts, which is President Trump's intent and the effect that it had on the audience. That was precisely the issue that was confronted by the court in Wisconsin right to life. There the question was whether or not the words advocated the defeat of a candidate, which was not constitutionally protected. Well, the issue of discovery, the district court stayed discovery as to the Trump defendants. But it's my understanding that discovery has not been stayed as to the other defendants. Is that correct? As I understand it, although I also understand these are not my clients, so I'm a little hesitant, that the discovery is not going forward. I think everybody's awaiting the outcome of this. But there's nothing to prohibit from going forward. Oh, no. They have every right to go after. All right. I mean, if their argument is they want to discern what the words had on the assaulters, the defendants, I mean, they can obviously depose those defendants. They can certainly depose the defendants. I don't think the defendants have any kind of legal argument that Trump, they were somehow Trump's agents. But they can go after these people who assault. You're saying discovery has not gone forward as those other defendants, even though it could. Those people engage in violent assaults under the allegations, so obviously you can go after them. Here we have a very unusual circumstance where they're saying somebody who didn't engage in violent assault and engaged in constitutionally protected speech can nonetheless be held liable. We think the issue with respect to President Trump is whether or not he engaged in constitutionally protected speech. Since we think it's quite clear that he did, then there's no way you can come after them, regardless of the effect on the two people who did engage in the assault. And that was really exactly the teaching of Wisconsin Right to Life, where there was an advocate test. Well, the way to figure out whether or not the speech is constitutionally protected is look at the speaker's intent and the effect on the audience. And Wisconsin Right to Life rejected that. It said, first of all, if you get into intent, then you're going to have to have very burdensome discovery, which itself is a great burden on constitutionally protected speech. It also said it would create bizarre, that was their word, the bizarre rule that if the same words came out of two different people's mouths, one would be constitutionally protected and one wouldn't, depending on the speaker's intent. Also, in terms of the effect on Bamberger and Heimbeck, they said we're not going to get into effect for the same reason, because it would, A, involve burdensome discovery, but more importantly, it would put the speaker's right to speak at the mercy of how the audience interpreted it. And that was the point that this court made in Bible Believers, where it said a hostile audience reaction cannot convert protected speech into unprotected speech. So the audience's reaction is really not something that tells you about the constitutional validity of the word spoken. Again, the essential teaching of Wisconsin Right to Life is that needs to be objectively viewed and did the unambiguously convey unprotected speech. We also get that, of course, from Hess and Claiborne, where it was conceded that the words might have been perceived, might have been understood as advocating violence, but since we err on the side of not penalizing speech, that would not be done. The final point I'll make in terms of discovery is, of course, there's really no point to the discovery. If you're looking at the words in the context, we already know what the words in context are. They were alleged in the complaint, and if they are woefully insufficient in the complaint, then obviously discovery is not going to matter. They indeed have a film of the words in the context, which we're not disputing. So if you engage in this very burdensome discovery and go to trial with Mr. Trump and the Trump campaign still involved, at the end of that laborious process, all you're going to do is say, as a matter of law, everyone agrees it's a legal question, these words don't rise to the level of constitutionally unprotected speech. So all of this discovery into these external events would be meaningless. So if you had a situation where you have these recurring campaign rallies, and there's certain words that trigger certain responses. So you go through, and you go through the litany of different things, and first you go through a locker up, and then there's another one, make America great, and then when there's a protester, there's the get him out of here. And the expected response to get him out of here is that the crowd swells, and they identify what the irritant is, and they take the person physically and or apply excessive force and either beat them up or do whatever it is. And that's the pattern, that's the way it goes at each one of these rallies. And does it matter there that all he says is get him out of here? I would accept hypothetically the notion that if there had been a consistent pattern of saying the words get him out of here, and it was understood in that context that the normal English usage didn't apply. That get him out of here was really go beat them up, then they might have some argument about getting into these prior events. But the key thing when you look at the three events that they've alleged in their complaints that preceded this event, they never suggest that the words get him out of here were ever uttered, much less that they were understood as some kind of code word for violence. If you walk through the three examples they gave you, the one was the Alabama event before. First of all, the words they quote from President Trump were not stated at the rally. They were stated after the rally where he was saying that somebody maybe should have been roughed up. So it doesn't even tell you anything about rally related speech. The second one was saying in the old days people engaged in this kind of behavior, they would be taken out on a stretcher. And it's not true that that led to any kind of violent reaction by the audience, because obviously he was talking about the old days, a time that had passed. The third example they give is he said something like knock the crap out of them if they're going to throw a tomato at me. So even in that context, he's making the point that if somebody's about to assault me, you can protect me. Obviously that has no application here, because they were arguing they were alleging a peaceful protest, not on the verge of assaulting President Trump. So the summary of the three events that preceded this that they think are relevant, the two key points I'd like the court to focus on is one, nowhere do they suggest that the words get them out of here had some significance along the lines of your Hunter's hypothetical to mean something different. And in fact, the fact that they're pointing to all these other words suggests that those are the ones, if any, that would have spurred violence. But he didn't say any of those other words here, plus which for the reasons I've articulated, all of these prior events are clearly distinguishable from what happened in Louisville and what they're claiming. What I was really getting at is whether you can look at the context. I mean, you made the point that it can't be the case that the same words out of two different mouths have different consequences. But I think that you just succeeded. The context matters. Sure. I suppose if you said the same words at a high school graduation and one that was a tinderbox on the verge of violence, then you might have a different result in terms of whether it was inciting violence. But the key point there, I think, Your Honor, is to look at the Supreme Court cases involving these. All of these were much more racially tinged tinderboxes than anything going on here. In Claiborne, a black child had just been shot by Mississippi police in the late 60s. The Supreme Court said that the community was, quote, at the breaking point in terms of racial tension, which had started all of this. In Hess, it was a Vietnam War protest where they'd already resisted the police and arrests had been made. So a very highly contentious atmosphere. In Bible Believers, as you know, they were invading the Arab International Festival with disgusting comments about Muslims and the Prophet. And Brandenburg was a Klan rally. So my point is, these issues never really arise unless the situation has some potential for people to engage in controversial activities. But we've already stipulated to the context. We already know what the context was. We already know what the two people did in response, so discovery won't illuminate that in any way, short, or form. Nor will discovery illuminate what happened at the prior events. We already know what the context is. If they weren't in the public domain, then they couldn't have any relevance to Louisville because nobody in Louisville would have known what had happened at these prior events. Mr. Carvin, you'll have your three minutes rebuttal. Any further questions at this time? Thank you. Good morning. May it please the court. Opposing counsel. Good morning, your honors. My name is Dan Cannon. I'm here representing the plaintiffs in this matter. And Mr. Trump, throughout his campaign, intentionally used crowd violence to suppress dissident, unpopular, and counter-majoritarian speech. That is the kind of coarse speech that the First Amendment traditionally is supposed to protect. And is now seeking to use the First Amendment as a shield, simply because his own words prompted the sort of violence that he had been asking for publicly to happen at these rallies for a period of months. Do you disagree, Mr. Cannon, that we at least start with the words themselves? We start with the words themselves, and I think that the rule that is being urged by counsel is that you start with those words completely devoid of context. And the rule that they're asking for here, I think, is unprecedented. It's a pretty simple question. Do you start with the words? Now, if you start with the words, then you may go someplace next, and maybe it's context, maybe it's other things. But the first thing we do is look at the words, right? Yes, sir. And I think it's impossible to look at those words afterwards. First thing we do is look at the words, right? Yes, sir. Yes, sir. Now, what word or words, when we're just looking at the words, this is the first step, not precluding you from however many steps you want to take after that, what is it about the words themselves that rise to the level of inciting a riot? And this is our overall point, Your Honor. I think looking at those words in a vacuum without any reference to context whatsoever in this situation and, frankly, in any First Amendment situation is impossible. Courts have always looked at the context in which, as a threshold matter or otherwise, courts have always looked at the context. I take it, based on your answer or your non-answer, there's nothing about the words themselves. Just at the first step, the words themselves don't incite violence. No, Your Honor. I believe that in this case you've got a situation that, again, is something of an outlier among First Amendment cases, particularly incitement cases, where you have a direct command being given. This was important to the district court's analysis. So I do think this is different from Hess. I do think it's different from Claymore and the other incitement cases that have been decided by the Supreme Court in that you've got an explicit command. You've got a direct imperative to take immediate action. I think that's all true. It says, get them out of here. That's either four or five words, however you want to count them. So none of them speak to the manner in which somebody gets these protesters out of the rally. Would that be fair to say? And that underscores the point that you can't look at these words completely devoid of context. Because there is no way to understand, get them out of here, without understanding who it's being spoken to, which is something that was put into controversy by the defendants at the beginning of this case. Well, they could have gotten them out of there peacefully, correct? They could have gotten them out of there peacefully. They could have been asked to leave peacefully. All right. So if you can interpret the words both of those ways, then at least on the face of the words, there's nothing that incites somebody to use violence as one of multiple means to get them out of there, is there? I would agree with that, Chuck. All right. So we're okay on the words. So then we have to put the words in context. Now, if the context is what happened in these prior rallies, I think you would have a good argument if you said, get them out of here and do what they did to them in Akron or wherever a prior rally was, if that had involved excessive violence. But that didn't happen here, right? That's correct, Your Honor. Those weren't the explicit words that were said. Well, the words were don't hurt them right after get them out of here, right? The words that he spoke were don't hurt them. Yeah. Okay. So you couple that with get them out of here. Isn't it clear that he is not advocating violence? Not at all in context, Your Honor. At least he's advocating don't hurt the protesters, right? I don't believe so, Your Honor. You don't think he's okay? Why? Because, number one, we would contest whether or not Mr. Trump was sincere. He goes right on to say, in the old days, now we have to be so nice. And isn't it too bad that we have to be so nice? Because the press, if I say, go get them, then I get in trouble with the press. And if I say, don't hurt them. You've injected a whole other concept now that I don't think is even in the briefs, and that's sincerity. Is there a case that addresses how sincere or insincere somebody is when they say words? I think all of this Court's true threats, all of the Supreme Court's and this Court's true threats, jurisprudence, address that. And I think virtually anything. Do they use the word sincerity? I don't know if they use the specific word sincerity, Your Honor, but that is what they examine. And particularly in a criminal context, if you look at the criminal jurisprudence, particularly under solicitation, under other inchoate crimes that are speech-based offenses. And we cite in our brief to a case called United States v. White that comes out of the Seventh Circuit. But it's exemplary of the kind of cases that you run into in the federal law that interprets solicitation and other crimes that are based upon speech. In the facts in that case, you've got a defendant, a criminal defendant, that makes a blog post in 2005 that says, it would be great if all the jurors that were sitting on this case got assassinated. And then three years later makes another post putting a juror's information, personal information, it's just the juror's personal information and that's it. Under the defendant's test, that indictment would have to be thrown out. That indictment would be invalid because it doesn't specifically advocate for violence within those ways. And what the Court says in that case, what Judge Posner says in that case, is that you have to look at the context in which this arises. Let's just stop for a moment, get you to take a breath here, on this concept of violence. Let's assume for purposes of the argument that somebody could interpret those words to utilize violence. Start with that assumption for a moment. Advocating violence alone, if that's all we have, does not violate the Kentucky statute, does it? No, Your Honor. So it has to be violence plus something else. In other words, in the context of the statute, it has to be tumultuous and violent conduct, and that creates a grave danger of personal injury to the other. So it's not just saying, even if he had said, rough him up on the way out, I'm having trouble seeing how that rises to the level of a riot. And again, when you look at those words in context, knowing what the Trump campaign knew about these rallies leading up to, and we cited, I think, in our briefing below, we cited something like six examples that happened prior to this March 1st rally. Knowing what they knew about what was likely to occur at these rallies, the sort of violence that was likely to occur. You contend that there was actually a riot within the meaning of Kentucky law in any of these prior rallies? I don't know that, Your Honor. I don't know if there was actually a riot that ever occurred within the meaning of Kentucky law in prior rallies. So this was, what, his seventh attempt to incite a riot and the only one that was successful? Is that what we're to believe? It wouldn't matter one way or the other, because the crime is... You want us to look at it in context. You want us to look at what happened previously. If these words were code words, dog whistle words, as your amici say, or whatever you want to call them, to lead to a riot, it seems like that argument would have some traction if there had been prior riots. The Kentucky statute doesn't require a riot actually occur. It's an inchoate crime. And so just simply asking for... It's something more than just advocating violence. Yes, sir. And again, this is what that was. This was an explicit command to take immediate action. What my colleague characterized it as is a tinderbox on the verge of violence. And he said if it was a tinderbox on the verge of violence, then we'd have a different situation. That's what this was. Where is there anything even in the complaint that alleges that this rally was a tinderbox on the edge of violence? Mr. Carvin was comparing that to things happening in the past where the community was full of racial tension. It's throughout... This is a rally. And I think it's important too that the court note that violence actually occurred in this case. That's again what makes this case an outlier in the prior incitement jurisprudence that we've been looking at. Violence actually occurs. And it doesn't occur until Mr. Trump gives the command. Well, it can't possibly be the test that you look to see whether the words satisfy the statute and don't violate the First Amendment because of what did or did not happen. I think that's right, Your Honor. But I think that it's evidence that... We've been attacked for not setting forth a plausible case that this could incite violence. And Mr. Trump's words incite violence. Our point is they did actually incite violence. And they did not incite violence. So you have a protester that's there. You have my client, Ms. Wambuma, who's there with a sign that has Mr. Trump's head on the body of a pig. And she's standing there in the crowd. They don't touch her. They don't do anything to her unless and until Mr. Trump gives an explicit command to take immediate action. And that's what this was. And I would steer the court... What did you think Mr. Trump made? Were people calling out? Were the signs creating distractions that detracted from his speech? To my knowledge, Judge, it was just... He saw Ms. Wambuma with the sign and then said, get her out of here. And there was no violence that had occurred to Ms. Wambuma up until that point. When we're trying to make these decisions that we're being asked to make in this case, how do you think we weigh the potential impact of one route infringing upon the First Amendment and one route not infringing on the First Amendment? Well, I think that there were a number of different routes that could have been taken by the Trump campaign here. I'm asking about the route we take, not what Trump could have done. I see. I think that this... It's Mr. Carvin's constitutional avoidance argument. I don't think that this court has to do anything other than uphold the rule from Bible believers, which... I can't hear you. The rule from Bible believers, Your Honor, which states in no uncertain terms that implicit encouragement of violent or lawless action is enough to get you past this threshold inquiry. And that's what we have here. And we've stated, I think, ample evidence to suggest that this implicitly encouraged violent or lawless action. And again, I would direct the court back to the criminal law, where you have situations of solicitation. There's a case that we've also cited in our briefing called United States v. Hale, where you've got a criminal defendant saying, wink, wink, nudge, nudge, don't do anything illegal. And those words on their face do not advocate any particular kind of violence. They don't incite violence. And under the defendant's test, you have to throw out that indictment. And I would propose to the court that you'd have to throw out a lot of these indictments if you were to just look at the words in a vacuum and completely devoid of context, which I believe is what the defendants are urging in this case. I'm really having trouble understanding how we have to throw out a lot of indictments under federal law because of how we interpret an incitement to riot statute in Tennessee. Excuse me, Kentucky. Could you explain that, please? Yes, Your Honor, because if the First Amendment is allowed to be an absolute defense to this based on just the facial meaning of the words without context, which is the way I understand the defendant's argument to go, then that would essentially nullify this court's jurisprudence on solicitation. It would nullify a lot of things, as pointed out by our amicus. It would nullify a lot of employment discrimination, where you have coded language. You're skipping right by the question of whether the words themselves in this case violate Kentucky law or the words in an indictment that are allegedly the source of an indictment violate one or more federal laws. You still have to look at the words. I think that's right. But the key thing is that the Kentucky law, just like the First Amendment, would look at those words in context. And just because there isn't an explicit call for violence on the face of the words in black and white does not mean that the speaker wasn't trying to incite a riot. And that's exactly what we have in this case. Just looking at the words in a vacuum without any reference to context, without any reference to what's happened before or since is a mistake. I think it would throw out decades of First Amendment jurisprudence in a lot of different areas, if you allow an absolute defense like that. And we just ignore, don't hurt them? Doesn't matter? No, I don't think we ignore it. But I think that we're entitled to discovery on it. Number one, I don't think on what the president intended. Something that has been called into direct controversy by the defendants in this case. So number one, they're saying that it's not plausible that he was even talking to the crowd because he was talking to security. And clearly that's the only plausible interpretation. So they've called his intent even in saying get him out of here in the question. But then secondarily, two things I'd say. One is just saying don't hurt him after you've already incited violence. That could be used as an affirmative defense, I suppose, or some sort of mitigating factor. But it doesn't excuse the incitement, the inciting conduct that's already occurred. In order for us to follow that argument, we'd have to assume that the words themselves did assert or encourage violence as the means of getting somebody out of there, correct? You're talking about get him out of here. Yes. You have to assume under your line of thought that get him out of here either explicitly or implicitly urges the use of violence to accomplish that means. You have to make that assumption in order to then be able to negate the concept of don't hurt him. Yes, Your Honor. And that assumption is made in the overall context in which those comments were made. Thank you very much. Briefly, Your Honor, first of all, this new notion that President Trump saw this thing and incited these other people to engage in violence is not in the complaint. It doesn't make a whole lot of sense because, among other things, the two people that they claimed didn't have any kind of anti-Trump signs were also violently assaulted according to their complaint. So that goes well beyond the pleadings. My major point is that we're not asking you to ignore the context. We're asking you to pay attention to the context. And the context, again, was something which is, as the Court put it in Claiborne, highly emotive language is being used at a public attendance. And that's where the courts need to proceed with the most extreme care before they get involved. And I'm perfectly happy for you to look at the prior events because the key takeaway from those prior events, which my opponent did not dispute, is the words, get him out of here, were never uttered, nor were they misunderstood as somehow connoting excessive violence. In terms of how you were supposed to interpret those words, yes, they did use the word implicitly in Bible believers, but I heartily encourage you to look at Bible believers. Because that tells you three things. It says that the scales are heavily weighted in terms of protecting the speech. It says it needs to be an objective standard in the text, not just in the footnote. It says that a tendency to elicit illegal activity, quoting Ashcroft, is not enough. This Court's decision in Briggs said you can't look at the implications of speech unless it's a very clear implication because it creates the grave danger of trenching on protected speech. In Claiborne itself, the Supreme Court decision, they said these words might have been understood as a call to physical violence. That's at page 927 of the opinion. But it said given the context and given the need to protect unprotected speech, to give this the breathing space that the First Amendment demands, we as a matter of law are holding that these words are not actionable. All of those things make it clear that even if this did violate the statute, which it plainly does not, the Supreme Court's decision in Briggs is not enough. That there's no way that this can be penalized under the First Amendment. And so none of my opponent's answers to you have turned a statement, get them out of here, don't hurt them, into meaning precisely the opposite. Which is hurt them while you're getting them out of here. And the First Amendment won't allow you to twist a speaker's words to mean the opposite of what it says. In this case, under Bible believers, should be shut down at the outset of this without engaging in the burdensome discovery on speakers that itself greatly chills First Amendment protected speech. Unless there are additional questions, I have nothing else to say. Thank you.